UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INSTITUTE FOR POLICY STUDIES, )
                               )
          Plaintiff,           )
                               )
     v.                        ) Civ.No. 06-CV 00960 (HHK)
                               )
CENTRAL INTELLIGENCE AGENCY,   )
                               )
          Defendant.           )
_____)

**DECLARATION OF MARILYN A. DORN
DEPUTY CHIEF POLICY AND COMMUNITY ACTION STAFF
NATIONAL CLANDESTINE SERVICE
CENTRAL INTELLIGENCE AGENCY**

I, MARILYN A. DORN, hereby declare and say:

1.  I am the Deputy Chief of the Policy and Community Action Staff (PCAS) of the National Clandestine Service (NCS) of the Central Intelligence Agency (CIA).

2.  The NCS is the organization within the CIA responsible for the clandestine collection of foreign intelligence from human sources.

3.  Through the exercise of my official duties, I am familiar with this civil action.  I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

4. . This declaration serves to justify, to the greatest extent possible on the public record, CIA's response to Plaintiff's 1 June 2004 FOIA request. In particular, this declaration describes the process by which CIA personnel carefully reviewed documents containing information responsive to Plaintiff's FOIA request to determine what information, if any, could be released to Plaintiff in accordance with this Act, and what had to be withheld pursuant to applicable FOIA exemptions.

5. Where documents have been denied in full, I have determined that no reasonably segregable, non-exempt portion of those documents exists. My determination was based upon a careful review of the documents in this case, both individually and as a whole. I wish to be clear, however, that a line-by-line review was conducted for all the documents at issue to identify and release reasonably segregable, non-exempt portions of documents.

6. I have determined that, with respect to Plaintiff's 1 June 2004 request, all responsive CIA documents contain -- in whole or in part -- information exempt from release for the following reasons:

    (a)       information is currently and properly classified pursuant to E.O. 12958, as its disclosure reasonably could be expected to cause damage to the national security, and

is therefore exempt from disclosure pursuant to FOIA exemption (b)(1); and/or

(b)    information, if released, reasonably could be expected to disclose matters solely related to the internal personnel rules and practices of the Agency, and is therefore exempt from disclosure pursuant to FOIA exemption (b)(2); and/or

(c)    information concerns the organization, functions, and names or official titles of personnel employed by the CIA, all of which are protected from disclosure under Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 403g, and therefore exempt from disclosure pursuant to FOIA exemption (b)(3);[1] and/or

(d)    information concerns other individuals the release of which would constitute a clearly unwarranted invasion of their personal privacy, and is therefore exempt from disclosure pursuant to FOIA exemption (b)(6); and/or

(e)    information was compiled for law enforcement or investigatory purposes and its disclosure would reveal investigative techniques and procedures, and is therefore exempt from disclosure pursuant to FOIA exemption (b)(7)(E).

7.  Some of the responsive documents located in the CIA's files contain information originated by the

---

[1] CIA may withhold intelligence sources and methods under authority of the CIA Act of 1949.  Specifically, Section 6 of the CIA Act provides that CIA shall be exempt from the "provision of any other laws which require the publication or disclosure of the organization, function, names, official titles, salaries, or numbers of personnel employed by the Agency."  50 U.S.C. 403g.  To this end, CIA cannot disclose any information relating to its core function:  collection of foreign intelligence through its intelligence sources and methods.  See id.  Thus, CIA may invoke FOIA exemption (b)(3) to protect intelligence sources and methods.

Department of Defense ("DOD"), Department of State ("DOS"), National Security Agency ("NSA"), and the Drug Enforcement Agency ("DEA"). In accordance with standard procedures, CIA coordinated these documents with the DOD, DOS, NSA, and DEA. E.O. 12958. § 3.7(b) mandates this coordination, commonly referred to as the "third-agency rule". Certain information was determined by the DOD, DOS, NSA, and DEA to be exempt from release under one or more exemptions listed above.[2]

8. Finally, some of the responsive documents located in the CIA's files were originated by the DOS and the DEA. In accordance with standard procedures, CIA referred these documents to the DOS and DEA for direct response. E.O. 12958 § 3.7(b) mandates this referral, commonly referred to as the "third-agency rule". I understand that the DOS and DEA will review these documents and provide a direct response to Plaintiff. For these documents, any information that the DOS or DEA determines to be exempt from release will be addressed in declarations filed by the DOS and DEA.[3]

---

[2]After review, the NSA determined that certain information contained in the documents is properly classified in accordance with the criteria for classification in Section 1.4 of Executive Order 12958, as amended and cited 5 U.S.C. §552(b)(1). NSA also cited 5 U.S.C. §552(b)(3) and the following specific statutes: 50 U.S.C. §402, note (*Public Law 86-36 Section 6*) and 50 U.S.C. §403-1(i).

[3] The DOS has notified the Agency that it will release their document in full to Plaintiff. DOS will send its response to Plaintiff directly.

9.   Prior to referring one of the documents described in paragraph 10 to the DEA, the CIA reviewed the document and identified certain information contained in the document that was originated by the CIA.  The CIA determined that the information was exempt from release under one or more exemptions listed above.  CIA exemptions will be addressed in the DEA's Vaughn Index and Declaration.

10.  For the Court's convenience, I have divided this declaration into four parts:  (a) CIA's records systems; (b) CIA's procedures for responding to FOIA requests; (c) CIA's actions in response to Plaintiff's FOIA request; and (d) the bases for the FOIA exemptions exercised by CIA in this action.  Accompanying this declaration (attached as Exhibit A hereto) is a *Vaughn* index detailing each responsive document withheld by CIA in whole or in part (ten documents in total) and the applicable FOIA exemptions for those documents.

CIA RECORDS SYSTEMS

11.  Any intelligence or security agency continually faces the risk that there may be a spy within its ranks or that it may be subject to hostile penetration.  Prudence dictates that an agency take appropriate counterintelligence and security precautions to minimize

5

the potential national security damage that could result
from a spy in the agency's midst.  CIA implements this
policy through decentralizing and compartmenting its
records systems.

12.  Another way to minimize such damage is to limit
the amount of information to which any particular employee
has access.  CIA limits employee access to information by
employing a "need-to-know" policy, which provides that an
employee has access only to that information required to
perform the employee's duties.

13.  While the counterintelligence advantage of these
practices are obvious, one disadvantage is equally obvious:
the inherent inefficiencies created in the records search
and retrieval processes.  These inefficiencies affect not
only the day-to-day activities of CIA employees trying to
perform their mission, but also the process of responding
to FOIA/Privacy Act requests.

### PROCESSING OF FOIA REQUESTS

14.  The Information and Privacy Coordinator,
Information Management Services (IMS), located within the
Information Services Center (Directorate of Support), is
the initial reception point for all FOIA requests.  Under
the direction and supervision of the CIA Information and
Privacy Coordinator, experienced IMS information management

professionals analyze each request and determine which CIA

components might reasonably be expected to possess records

responsive to a particular request.  IMS then transmits a

copy of the request to each relevant component.  When a

request is broad, it is quite common for IMS to transmit

the request to many components.  Because CIA's records

systems are decentralized and compartmented, each component

must then devise its own search strategy, which includes

identifying which of its records systems to search as well

as what search tools, indices, and terms to employ.  The

information management professionals (in each component)

who conduct FOIA searches are the same professionals who

also search records to support the component's daily

mission.

15.  All CIA components are contained within one of

five directorates or office clusters:  the Directorate of

Intelligence (DI), the National Clandestine Service (NCS),

the Directorate of Science and Technology (DS&T), the

Directorate of Support (DS), and the Director of CIA Area

(DCIA).

16.  After a tasked component (within one of the

directorates described above) locates documents in response

to the FOIA request, officers must review the documents to

determine whether they, in fact, respond to the request.

Because of the nature of a particular records system, or the search tools, indices, or terms employed, a search may locate many documents that are not responsive to the request. In fact, it is quite common for the number of non-responsive documents to far exceed the number of responsive documents.

17. After officers remove the non-responsive documents, the component must then review the remaining documents to determine which FOIA exemptions apply, and whether they can reasonably segregate non-exempt information from exempt information. If officers determine that no segregable, non-exempt portions of documents could be released without potentially compromising classified information, information concerning intelligence sources and methods, or other information protected by FOIA exemptions, then such documents may be denied in full. Thus, in evaluating responsive documents, officers must segregate exempt information to avoid the inadvertent disclosure of classified information or intelligence sources and methods. This process is laborious and time-consuming.

18. In the course of reviewing documents for exempt information and segregability, a component frequently identifies information that it must coordinate with or

refer to another CIA component or another agency because the other component or agency originated the information or otherwise has an equity in it.[4]  This coordination and referral process itself can be quite time-consuming because other components and agencies have their own mission and FOIA/PA priorities.

19.  When all of the components and agencies complete their respective reviews, IMS professionals, under the direction and supervision of the CIA Information and Privacy Coordinator, incorporate all of their recommendations regarding exemption, segregation, redaction, and release.  These IMS professionals then conduct a review from a corporate perspective on behalf of the entire CIA.  In this review, the IMS professionals resolve conflicting recommendations, ensure that the release or withholding determinations comply with law and published CIA regulations, identify additional exempt information that reflect overall CIA equities, produce the integrated final record copy of each document, and respond to the requestor.

20.  During the corporate review, the CIA Information and Privacy Coordinator may withhold additional information in order to protect overall CIA equities.  In response to a

_____

[4] See Exec. Order No. 12958 § 3.7(b).

broad FOIA request, the searches may locate many documents
in many components.  When considered individually, a
particular document may not indicate on its face that it
contains exempt information.  Nevertheless, when reviewers
consider all responsive documents in total, it frequently
becomes apparent that, considered collectively, the
documents reveal additional information exempt from
release.  For this reason, IMS cannot make final release
determinations with respect to any particular document
until IMS reviews all responsive documents.

21.  In this case, CIA employees who performed the
necessary FOIA searches:  (i) have access to all pertinent
intelligence, operational and administrative records; (ii)
are qualified to search those records; and (iii) regularly
search those records in the course of their professional
duties.

<u>PLAINTIFF'S FOIA REQUEST</u>

22.  By letter dated 1 June 2004, Plaintiff submitted
a FOIA request to CIA.  Plaintiff's FOIA request sought
"all records which mention or relate to the Colombian
organization known as 'PEPES' or the Perseguidos por Pablo
Escobar, People Persecuted by Pablo Escobar, Pablo Escobar,
and/or the death of Pablo Escobar."  A true and correct
copy of Plaintiff's 1 June 2004, letter is attached as

10

Exhibit B hereto.  CIA assigned Plaintiff's request

reference number F-2004-01528.

23.  In a 29 June 2004 letter, CIA acknowledged

receipt of Plaintiff's FOIA request.  CIA informed

Plaintiff that it had searched its "database of previously

released records using the search terms 'pepes' and

'Escobar'.  CIA provided Plaintiff with two requester

reports listing documents that were "located in a search

conducted on behalf of a previous requester."  In the

letter CIA explained, "if you would like to order documents

from the requester reports, please clearly mark those you

want and return the entire listing to us, bearing in mind

that some documents might be duplicates and some may not be

relevant to your request."  CIA also denied Plaintiff's

request for a fee waiver and stated that Plaintiff's

request falls into the "educational and non-commercial

scientific institution" fee category.  A true and correct

copy of CIA's 29 June 2004 letter is attached as Exhibit C

hereto.

24.  On 13 October 2004, Plaintiff appealed the CIA's

response to the Plaintiff's 1 June 2004 FOIA request.

Plaintiff claimed that, "the CIA Failed to Conduct a

Reasonable Search of its Files" and that "the CIA has

violated IPS's right to due process by failing to

adequately respond to IPS's FOIA request." A true and correct copy of Plaintiff's 13 October 2004 letter is attached as Exhibit D hereto.

25. On 30 November 2004, the CIA informed Plaintiff that it had accepted its appeal and would arrange for an Agency Release Panel ("ARP") to consider the appeal. A true and correct copy of CIA's 30 November 2004 letter is attached as Exhibit E hereto.

26. On 16 February 2005, Plaintiff asked CIA for an "immediate response from the ARP and a status of the search for documents." A true and correct copy of Plaintiff's 16 February 2005 letter is attached as Exhibit F hereto.

27. On 6 April 2005, Plaintiff again requested an immediate response from CIA regarding its 13 October 2004 appeal and requested a second time a waiver of document fees. Plaintiff stated that, "IPS appeals the CIA's response to the June 1, 2004 FOIA request on the grounds that": "1) the CIA should not have limited its search to previously released documents; 2) the CIA should have searched for all records which mention or relate to the Colombian organization known as the 'PEPES' or the Perseguidos por Pablo Escobar and should not have limited its search to PEPES and Escobar and/or the death of Pablo Escobar and should not have limited its search to PEPES and

Escobar; and 3) should not have limited its search to Foreign Broadcast Information Service." A true and correct copy of Plaintiff's letter is attached as Exhibit G hereto.

28. On 13 May 2005, CIA responded to Plaintiff's 16 February 2005 letter by stating that the CIA was "still processing" Plaintiff's appeal and that "every reasonable effort will be made to complete a response as soon as possible." A true and correct copy of CIA's letter is attached as Exhibit H hereto.

29. On 23 May 2006, Plaintiff filed a complaint for injunctive and declaratory relief in this Court. A true and correct copy of the Complaint is attached as Exhibit I hereto.

30. By letter dated 15 December 2006, CIA notified Plaintiff that, "its processing of Plaintiff's request included a search for records in existence as of 1 June 2004" and that "as a matter of administrative discretion, we will not charge fees in this case."

31. Additionally, in CIA's 15 December 2006 letter, CIA also notified Plaintiff that, with respect to that portion of the Plaintiff's request that seeks information relating to PEPES or the *Perseguidos por Pablo Escobar*, People Persecuted by Pablo Escobar, and/or the death of

Pablo Escobar, "we have completed a thorough search for records responsive to your request and":

    (A)   "located the enclosed eight documents, which can be released in segregable form on the basis of FOIA exemptions (b)(1), (b)(2), and (b)(3)";

    (B)   "located additional material, which we have determined is exempt from release and must be denied in its entirety on the basis of FOIA exemptions (b)(1), (b)(2), (b)(3), (b)(6), and (b)(7)(E)";

    (C)   "identified one document that requires this Agency to consult with other federal agencies" and that once the consultation process was completed, CIA would "provide a supplemental response concerning that document"; and

    (D)   "located additional United States Government material that was not originated by CIA.  This material appears to be relevant to your request, and has been referred to the originating agencies for review and direct response to you".

32.  Also in CIA's 15 December 2006 letter, CIA notified Plaintiff that, "[w]ith regard to that portion of your request pertaining to Pablo Escobar, in accordance with section 3.6(a) of the Executive Order 12958, as amended, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to this portion of your request."  CIA further explained that, "the fact of the existence or nonexistence of requested records is properly classified and is intelligence sources and methods information that is protected from disclosure by section 6

of the CIA Act of 1949.  Therefore, the Agency has denied

this portion of your request pursuant to FOIA exemptions

(b)(1) and (b)(3)."  A true and correct copy of CIA's 29

November 2006, letter is attached as Exhibit J hereto.

33.  By letter dated 9 February 2007, CIA provided IPS

with a supplemental response concerning the document that

required the Agency to consult with other federal agencies.

With regard to that document, the Agency stated, "The

consultation process is complete and we have determined

that the document can be released in segregable form on the

basis of FOIA exemptions (b)(1) and (b)(3)".  A true and

correct copy of CIA's 5 January 2007 letter is attached as

Exhibit L hereto.

34.  On 15 December 2006 and 9 February 2007, for the

document described in paragraph 33, CIA produced to

Plaintiff the attached *Vaughn* document index, pursuant to

the Court's 17 October 2006 scheduling order, describing

the ten CIA documents (1 denied-in-full and 9 partial-

release documents) at issue in this matter and setting out

the applicable exemptions.

<u>CIA RECORDS SEARCH</u>

35.  CIA produced records that were a product of a

reasonable, diligent and thorough search in records systems

15

where CIA officers reasonably expected to locate responsive records, if any existed.

36.  Initially, as was noted in paragraph 25 above, the CIA searched its database of previously released records using the search terms 'pepes' and 'Escobar'.  CIA provided Plaintiff with two requester reports listing documents that were located and released after a prior search on behalf of a previous requester.  The previous requester sought, "All records which mention or relate to the Colombia organization known as the "PEPES," or the *Perseguidos por Pablo Escobar*, People Persecuted by Pablo Escobar".

37.  After receiving the requester reports noted above, Plaintiff did not select any items from the requester reports, appealed CIA's response, and filed the current litigation.

38.  The appeals stage is an opportunity for the Agency to reevaluate its initial search and initiate new searches if CIA officers reasonably expect to locate responsive information from a search of additional records systems.  In this case, during the appeal and litigation stages, CIA reevaluated its initial decision to search its database of previously released records using the search terms 'pepes' and 'Escobar', conducted new record searches

on Plaintiff's request, and produced records to Plaintiff that were a product of a reasonable, diligent and thorough search in records systems where CIA officers reasonably expected to locate responsive records, if any existed.

39.  In this case, based on the nature of the Plaintiff's FOIA request, CIA officers determined that two directorates would be most likely to have responsive records:  the DI and the DCIA.

40.  CIA officers in the DI and DCIA were tasked to search for responsive documents.  CIA officers searched for the following items in Plaintiff's request: "PEPES" or the "*Perseguidos por Pablo Escobar*", "People Persecuted by Pablo Escobar", and/or the death of Pablo Escobar.  For reasons explained elsewhere in this declaration, CIA officers did not search for documents related to that portion of Plaintiff's request seeking records on Pablo Escobar.[5]  All reasonable efforts were made to identify and retrieve any records responsive to Plaintiff's FOIA request.

41.  The DI is the CIA component that analyzes, interprets, and forecasts foreign intelligence issues and world events of importance to the United States.  The DI is also responsible for the production of finished

---

[5] See ¶ 32, *supra* and ¶ 49-54 below.

intelligence reports for dissemination to policymakers in the United States Government. Appropriately-trained personnel regularly conduct FOIA searches of the DI records system as part of their normal responsibilities. Agency officers determined that the DI might reasonably contain documents responsive to Plaintiff's FOIA request, if indeed any existed. Accordingly, CIA officers directed the DI to search for information responsive to Plaintiff's request.

42. The DCIA is a cluster of offices directly responsible to the Director of CIA, and is distinct from the Agency's four main directorates (DI, NCS, DS and DS&T). The DCIA includes such components as the Office of Inspector General (OIG), Office of General Counsel (OGC), Office of Congressional Affairs (OCA), Office of Public Affairs (OPA) and Office of Protocol (OP). Appropriately-trained DCIA personnel regularly conduct FOIA searches of the DCIA records systems as part of their normal responsibilities. Agency officers determined that the DCIA might reasonably contain documents responsive to Plaintiff's FOIA request, if indeed any existed. Accordingly, CIA officers directed the DCIA to search for information responsive to Plaintiff's request.

43. In the course of reviewing documents for exempt information and segregability, as described in paragraph 20

above, the DI and DCIA identified information that required
coordination or referral to other CIA components because
the other component originated the information or otherwise
had equity in it.  The DI and DCIA referred or coordinated
documents with the NCS, DS, and DS&T.  The components
reviewed their equity in the documents and reported their
decisions back to IMS, the focal point for all FOIA
requests and decisions.  IMS consolidated all component
decisions and reported to Plaintiff one Agency decision for
all responsive documents.

44.  CIA officers did not task the DS&T, NCS, or DS to
search for responsive records.  The DS&T is the CIA
component responsible for creating and applying technology
to fulfill intelligence requirements.

45.  The DS is responsible for CIA's administrative
matters.  It maintains records on all current and former
CIA employees, whether employed in a contract or staff
capacity, as well as other individuals for whom security
processing or evaluation has been required (including those
who come to CIA's attention because of a
counterintelligence interest).  The DS's records system
also contains information regarding independent
contractors.

46.  The NCS is the organization within CIA responsible for the conduct of foreign intelligence collection activities through the clandestine use of human sources.

47.  Based upon the information plaintiff supplied at the time of its request and given the mission and functions of the DS&T, and DS, CIA officers determined that the DS&T and DS would not likely have information responsive to Plaintiff's FOIA requests.  Therefore, CIA officers did not task these directorates to search their records in response to Plaintiff's FOIA request.

48.  CIA officers also determined that any records that the DS&T or NCS potentially may have located would be found in DS&T and NCS operational files.  In connection with Plaintiff's FOIA request, the CIA did not search "operational files" of the NCS, DS&T and the Security Center.  This was entirely proper.  CIA's operational files contain records reporting information collected through intelligence sources and methods, and not subsequently disseminated to intelligence consumers.  (Records disseminated by NCS were located during the searches conducted by other CIA components.)  Pursuant to the CIA Information Act of 1984, Congress authorized the Director of Central Intelligence to exempt certain operational files

from the search, review and disclosure provisions of the
FOIA. See 50 U.S.C. § 431.  The DCI exercised his authority
under this statute and exempted specific operational files
from FOIA.

49.  Further, the CIA can neither confirm nor deny the
existence or nonexistence of records responsive to
Plaintiffs' request for information about Pablo Escobar.
This manner of response is commonly referred to as a
"Glomar" response.  The type of CIA response to a FOIA
request that neither confirms nor denies the existence or
non-existence of particular records protects a specific--
and narrow--type of classified fact.  By contrast, in a
typical circumstance, a FOIA requester submits a request to
CIA for information on a general subject, and the CIA
responds by conducting a search of non-exempt records and
advising whether responsive records were located.  If
records were located, CIA provides those non-exempt records
or reasonably segregable non-exempt portions of records,
and withholds the remaining exempt records and exempt
portions of records.  In this typical circumstance, the
CIA's answer, either to provide or not provide the records
sought, actually confirms to the requester (and the world,
for that matter) the existence or non-existence of such CIA
records.  Typically, this confirmation threatens neither

the national security nor the revelation of intelligence sources and methods, because the focus is on releasing or withholding substantive information of a broadly topical nature or of an event, and whether the CIA possesses or does not possess records on that topic or event is not itself a classified fact.

50.  The particular request by Plaintiff for information about Pablo Escobar, however, involves different and narrower circumstances, wherein the mere confirmation or denial of the existence of responsive records would reveal a classified fact--namely, whether the CIA has gathered information on a specific person(s) who was or appeared to be a foreign national. These matters must be approached in the reasonable manner of neither confirming nor denying the existence of such records when there has been no prior official acknowledgement by the Agency that it either has or does not have records or that there exists an overt relationship with the person(s). This response is necessary to safeguard intelligence sources and methods and U.S. foreign relations interests. Two examples will illustrate.

51.  First, if the CIA admits that it possesses intelligence information about a particular foreign national such as Pablo Escobar, the CIA essentially admits

to that foreign national that CIA intelligence methods have
been applied against him and he could take countermeasures
to identify, if possible, and frustrate the methods in
order to make his future activities undetectable by the
CIA.  If the foreign national's countermeasures are
successful, the CIA loses its ability to monitor his
activities.  Moreover, others who may be collaborating with
the foreign natioanl also will soon cease engaging in these
detectable activities with similar results.

52.  Second, if, on the other hand, the CIA admits
that it does not possess information about a particular
foreign national such as Pablo Escobar, the CIA essentially
admits to that individual that his efforts to conceal his
activities have been successful.  The result of CIA's
admission is that this foreign national would know that his
operational security practices have successfully defeated
CIA intelligence methods and that he can act with impunity.
Moreover, other foreign nationals could learn of and begin
to emulate this same successful pattern of undetectable
intelligence activities with similar results.

53.  Though the potential harm faced by the CIA from
the two preceding examples is self-evident, the harm faced
by the CIA is potentially magnified many times if a foreign
intelligence service were to submit multiple FOIA requests.

For example, if a foreign intelligence service were to
submit separate FOIA requests for information concerning
all nationals it suspected of being CIA collaborators, and
the CIA were to provide a response other than neither
confirming nor denying the existence of such records, the
CIA would, in essence, provide the foreign intelligence
service with information that would greatly aid in
eliminating the CIA's intelligence network in that country.

54.  Finally, the effective collection and analysis of
intelligence require the Agency to prevent disclosing to
our adversaries the specific persons and areas in which CIA
is interested and upon which it focuses its methods and
resources.  Every country or group has limited resources.
The disclosure to a potential U.S. intelligence target of
the areas and persons of CIA interest would indicate to
that target how CIA is allocating its resources.
Therefore, the target may array its counterintelligence and
security resources most efficiently to frustrate CIA.  The
more efficiently an intelligence target may apply its
counterintelligence resources, the more likely it will deny
the information of interest to the United States.

55.  Thus, contrary to Plaintiff's representations in
the Complaint, the CIA conducted an adequate search for the
records that the Plaintiff requested.  IMS officers tasked

the directorates most likely to have records responsive to
Plaintiff's request.   The officers requested a search for
all items in Plaintiff's request except for that portion
concerning Pablo Escobar.[6]   CIA personnel trained to conduct
FOIA searches as part of their regular job responsibilities
searched diligently for records responsive to the
Plaintiff's request.   All responsive documents that were
subject to partial release were tendered in redacted form
to Plaintiff.

### APPLICABLE FOIA EXEMPTIONS

### A.     FOIA Exemption (b)(1)

56.   FOIA exemption (b)(1), 5 U.S.C. § 552(b)(1),
provides that agencies are exempt from disclosing material
that is:

    (A)   specifically authorized under criteria
        established by an Executive order to be kept
        secret in the interest of national defense or
        foreign policy, and

    (B)   is in fact properly classified pursuant to such
        Executive order.

57.   Under the Agency's FOIA and Privacy Act programs,
CIA reviews classified information (classified pursuant to
E.O. 12958 or predecessor Executive Orders) responsive to
FOIA requests in order to determine if the information is
still properly classified.   Section 6.1(h) of E.O. 12958

---

[6] See ¶32 and 49-54, *supra*.

defines classified national security information as "information that has been determined pursuant to this order or any predecessor order to require protection against unauthorized disclosure and is marked to indicate its classified status when in documentary form."

58. I have determined that all of the information withheld on the basis of FOIA exemption (b)(1) is within three categories of classified information listed in Section 1.5 of E.O. 12958: "(b) foreign government information; "(c) intelligence activities . . . intelligence sources or methods, or cryptology;" and "(d) foreign relations or foreign activities of the United States, including confidential sources."[7] The withheld information is properly classified at either (i) SECRET pursuant to E.O. 12958 criteria because its disclosure could reasonably be expected to cause serious damage to U.S. national security, or (ii) CONFIDENTIAL pursuant to E.O. 12958 criteria because its disclosure could reasonably be expected to cause damage to U.S. national security. Accordingly, and as demonstrated in the attached *Vaughn* index, the withheld classified information is exempt from disclosure pursuant to FOIA exemption (b)(1). As described

---

[7]Classified material implicating U.S. "foreign relations or foreign activities" includes such information as the location of CIA facilities in a given country, as well as operations within that country.

in the attached *Vaughn* index, and as set forth below, the Agency has withheld documents in their entirety, or in part, based on these independent (b)(1) grounds.

## 1. Intelligence Sources

59. Certain information regarding intelligence sources was withheld because intelligence sources can be classified under E.O. 12958, and thus are exempt from disclosure based upon Exemption (b)(1). One of CIA's primary functions is to gather intelligence for the President and other government officials who make policy decisions. To do this, the Agency must often depend upon information that can only be gathered from knowledgeable sources under an arrangement of absolute secrecy.

60. Human intelligence sources can be expected to furnish information to CIA only when they are confident that CIA can and will do everything in its power to ensure that their cooperation will forever remain secret. In the case of a foreign national who has been cooperating with CIA, disclosure of that cooperation could cause the target government to take retaliatory action against that person, or, if he is no longer alive, against his surviving family and friends. Even more importantly, such disclosure places in jeopardy every individual with whom the foreign national has had contact.

necessitating the protection of their use, as well as the details of their use.

66.    Intelligence methods must be protected in situations where a certain capability or technique, or the application thereof, is unknown to those individuals or entities that would take countermeasures.  Secret information-collection techniques, capabilities, or technological devices are valuable (from an intelligence-gathering perspective) only so long as they remain unknown and unsuspected.  Once the nature of an intelligence method or its use is discovered, its continued successful use will be in serious jeopardy.  Indeed, disclosure of intelligence methods and practices would be of material assistance to those who would seek to penetrate, detect, prevent, or damage U.S. intelligence operations.  Thus, disclosure of a particular intelligence method leads to the neutralization of that method -- whether the method is used for information collection, the conduct of clandestine activities, or information analysis and evaluation.

67.    Foreign intelligence services view discovery of CIA methodology as one of their primary defensive missions.  Indeed, the cost ratio between developing and validating an intelligence method and negating that method via public disclosure is hugely disproportionate.  Intelligence

30

methods can cost many millions of dollars to develop, and a
single newspaper story generated by a single disclosure
will often end the utility of that method.  In fact, CIA
may lose intelligence during the time it takes to fund and
field a replacement method.

68.  In exercising and fulfilling its mission, CIA
must do more than prevent explicit references to an
intelligence method, it must also prevent indirect
references to such a method.  A primary vehicle for
gathering intelligence methods information is by reviewing
officially-released information.  We know that foreign
intelligence services have the capacity and ability to
gather information from myriad sources, analyze it, and
deduce means and methods (from disparate and even seemingly
unimportant details) to defeat CIA collection efforts.  CIA
officials have testified consistently over the years that
what may seem trivial to the uninformed, could be of great
significance to one who has a broader view of the issue and
can place the item of information in its proper context.
Thus, even seemingly innocuous, indirect references to an
intelligence method could have significant adverse effects
when juxtaposed with other publicly-available data.

69.  Accordingly, CIA may withhold information
concerning particular intelligence methods if CIA

determines that such information could reasonably be
expected to assist foreign intelligence services to the
detriment of the United States. Without such protection,
CIA would quickly become impotent.

70. Intelligence methods information also falls
within the ambit of CIA Act § 6, 50 U.S.C. § 403g, and thus
is exempt from disclosure under FOIA exemption (b)(3).
CIA's specific application of FOIA exemption (b)(3) is
described in more detail in the attached *Vaughn* index.

### 3. Intelligence Activities

71. Certain information regarding intelligence
activities was withheld because intelligence activities can
be classified under E.O. 12958, and thus are exempt from
disclosure based upon Exemption (b)(1). Information that
could lead to the unauthorized disclosure of intelligence
activities could cause serious damage to national security.
The fact that CIA may collect information on specific
foreign nationals is classified. Except in exceptional
circumstances, the CIA does not reveal the existence of any
specific intelligence collection effort(s) or disclose the
target or targets of such intelligence gathering
activities. CIA's covert intelligence interest in specific
individuals is also an intelligence activity, source and/or
method, the unauthorized disclosure of which reasonably

could be expected to cause serious damage to the national security.

72. To disclose the existence (or non-existence) of a particular intelligence collection effort, such as those directed at specific individuals, would reveal U.S. intelligence targets, needs, priorities, and capabilities to those who actively seek to take advantage of any U.S. national security weakness. The damage that would be caused by such an admission is clear. Hostile organizations, such as foreign intelligence services and other entities would be advised that their activities and information had been targeted by the CIA; future intelligence collection operations would be made more difficult by such a revelation and, as a result, the conduct of such operations would become even more dangerous.

73. As stated above, the effective collection and analysis of intelligence requires the CIA to prevent disclosing to our adversaries the specific persons and areas in which the CIA is interested and upon which it focuses its methods and resources. Therefore, the CIA generally cannot admit whether or not it has information on specific individuals.

74. Intelligence activities information also falls within the ambit of CIA Act § 6, 50 U.S.C. § 403g, and thus is exempt from disclosure under FOIA exemption (b)(3).[8] CIA's specific application of FOIA exemption (b)(3) is described in more detail in the attached *Vaughn* index.

### 4. Names and Internal Information

75. Certain information that could lead to the unauthorized disclosure of names and internal information could cause damage to national security. Thus, certain CIA names and internal information is classified under E.O. 12958, and thus are exempt from disclosure under FOIA exemption (b)(1).

76. CIA employee names (as well as employee numbers, titles, initials, signatures, etc.) are withheld routinely because the Agency does not normally disclose the identity and affiliation of employees who may come into public view during the course of their duties. Such employees may have served under cover or in sensitive positions or operations, may continue to do so, or may do so in the future.

77. To carry out its mission, the Agency must employ a variety of cover mechanisms to conceal the true affiliation of its employees involved in collecting intelligence information or conducting clandestine

operations.  A CIA officer's cover protects him in current

and future assignments.  The officer's cover also protects

the security of past intelligence operations in which the

officer has been engaged, and future intelligence

operations in which the officer may engage.

78.  Indeed, the very purpose of cover is to provide a

believable, non-threatening reason for a CIA officer to

move around and meet individuals of intelligence interest

to the United States, and to do so without attracting undue

attention.  The names of specific CIA employees who work,

or have worked, under cover are, with few exceptions,

classified at the CONFIDENTIAL level.  The mechanism of

such cover can be classified at the SECRET level.

Disclosure of cover mechanisms would expose and officially

confirm those mechanisms, hindering the cover program's

effectiveness for ongoing and future intelligence-gathering

operations.  Moreover, such disclosure could compromise

past, present, or future intelligence operations or

activities.

79.  In addition, disclosure of the identity of CIA

employees who work, have worked, or may in the future work

undercover, could jeopardize the employee's life or

physical safety -- as well as that of the employee's family

-- and that of those intelligence sources and other

individuals with whom he has had contact.  To this end, if an officer's cover is compromised, he becomes a target for hostile intelligence services and terrorist organizations.

80.  Next, internal CIA filing information has been withheld because it tends to provide insight into the records systems structure at CIA.  Similarly, titles or other organizational identifiers and filing instructions of CIA internal organizational components have been deleted. All of this information has been withheld to prevent public release of CIA personnel, structure, organization, and procedures, all of which could be used in hostile penetration or manipulation.  Because such information is classified to the SECRET or CONFIDENTIAL level, it is exempt under FOIA exemption (b)(1).

81.  Additionally, CIA Act Section 6 exempts CIA from the provisions of any law requiring publication or disclosure of information concerning the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency.  See 50 U.S.C. § 403g. On the basis of this statute -- and thus under FOIA exemption (b)(3) -- CIA employees' names and personal identifiers (e.g., employee signatures, employee numbers or initials), titles, file numbers, and internal organizational data are absolutely protected from

36

disclosure by law and have been redacted from the documents described in the *Vaughn* index.[9]  Section 6 requires no showing of harm.

### 5. Cryptonyms and Pseudonyms

82.  CIA disclosure of cryptonyms and pseudonyms, which are word and letter codes substituted for actual names or identities, could also lead to the unauthorized disclosure of intelligence sources and methods.  Cryptonyms and pseudonyms have been withheld from disclosure pursuant to FOIA exemptions (b)(1) and (b)(3).

83.  Cryptonyms are used in cables and other correspondence to disguise the true name of a person or entity of operational intelligence interest, such as a source, foreign liaison service or covert project. Pseudonyms are codenames used solely within internal Agency communications.  When obtained and matched to other information, cryptonyms and pseudonyms can assist someone in deciphering a communication's proper cognitive framework.  For example, the reader of a message is better able to assess the value of its contents if the reader knows the identity of the particular individual or project by its cryptonym or pseudonym.  And by knowing a cryptonym or pseudonym's meaning, a reader may be able to identify

---

[9]As discussed above, FOIA exemption (b)(2) also protects information pertaining to the internal administrative practices of CIA.

the CIA intelligence source or CIA employee.  Thus, by
using these codewords, CIA adds an extra measure of
security, minimizing the damage that would flow from an
unauthorized disclosure of intelligence information.

84.  The mere use of a cryptonym or pseudonym to
describe a project or person is an important piece of
information in a document.  The use of codewords may, on
their face, signal to a reader the importance of the
project or person signified by the codeword.  By disguising
individuals or projects, cryptonyms and pseudonyms mitigate
the nature of the security breach if a document is lost or
stolen.

85.  While release or disclosure of isolated codewords
might not necessarily cause damage to national security,
their disclosure in aggregate or in a particular context
could make it possible to fit disparate pieces of
information together, and deduce the identity or nature of
the person or project for which the cryptonym or pseudonym
stands.  Thus, because cryptonyms and pseudonyms are
themselves intelligence methods that also protect other
intelligence sources and methods, information that would
disclose cryptonyms or pseudonyms is appropriately
classified under E.O. 12958 as either SECRET or

38

CONFIDENTIAL, and properly withheld under FOIA exemptions (b)(1) and (b)(3).

### 6. Foreign Government Information

86.  Certain information regarding foreign government information was withheld because foreign government information can be classified under E.O. 12958, and thus is exempt from disclosure based upon Exemption (b)(1).  The documents at issue reveal CIA intelligence relationship(s) with foreign intelligence service(s).  Both the fact of and the information shared through CIA's intelligence-liaison relationships can be classified under E.O. 12958 because its disclosure could cause serious damage to national security.  The documents at issue are operational cables that report information received via such a liaison relationship.

87.  The information provided to the CIA by the intelligence services of foreign countries with which the CIA maintains a liaison relationship is provided only upon a guarantee of absolute secrecy.  If CIA abrogates this agreement, the government with whom this relationship exists could be subjected to internal and external political pressure.  As a result, the scope of the liaison relationship should be curtailed, resulting in a loss to the U.S. Government of valuable foreign intelligence.  The

foreign government could even be compelled by political pressure to take defensive actions, such as a reduction of the approved CIA presence in that country, further reducing CIA's ability to collect intelligence about other countries or persons operating in that country.  It is also possible that liaison exchanges could become more formalized, with fewer regular information exchanges.  Such an environment would reduce CIA's access to foreign intelligence.

88.  Officials of foreign governments with which CIA maintains an official liaison relationship provide information in confidence to the CIA on issues of importance to United States foreign relations and national security.  Such information is highly sensitive and is offered to the CIA in strict confidence.  Officials of such services convey information to the CIA with the express understanding that the content of the information – and indeed, the fact of the liaison relationship through which the information was provided – will forever remain a secret.

89.  Consequently, any official acknowledgement by the CIA of past or current liaison relationship could cause serious damage to relations with that organization (and possibly other liaison relationships as well), and would likely result in a significant loss of intelligence

information for the United States Government, thereby causing serious damage to national security.  Therefore, I have determined that any information which reveals the fact of and/or the nature of CIA's liaison relationships with a foreign country is properly classified SECRET pursuant to the criteria of Executive Order 12958, Sec. 1.4(c) and is thus exempt from disclosure pursuant to FOIA exemption (b)(1).  Exec. Order 12958 expressly provides that the unauthorized disclosure of foreign government information is presumed to cause damage to the national security under Section 1.1 (c) of Exec. Order 12958, and thus it is exempt from disclosure pursuant to FOIA exemption (b)(1).  Release of information provided by a foreign government would damage foreign relations.

90.  In addition, certain information in this case is also properly classified SECRET pursuant to Exec. Order 12958 because it falls within another category of information which may be protected:  information, the disclosure of which, could reasonably be expected to cause serious damage to the foreign relations (Sec. 1.4(d)).

91.  As discussed above, disclosure of information responsive to Plaintiff's FOIA request which pertains to the CIA relationship with a foreign intelligence service could reasonably be expected to cause serious damage to the

national security through compromise of the source and method and thus is exempt from public disclosure under FOIA exemption (b)(3). Such information is also currently and properly classified SECRET, and is coextensively exempt from disclosure pursuant to FOIA exemption (b)(1). As noted above, this information is also classified under two other provisions of Exec. Order 12598: information, the disclosure of which, would damage foreign relations and foreign government information.

92. This information also falls within the ambit of CIA Act § 6, 50 U.S.C. § 403g, and thus is coextensively withheld from disclosure under FOIA exemption (b)(3).[10] CIA's specific application of FOIA exemption (b)(3) is described in more detail in the attached *Vaughn* index.

### B. FOIA Exemption (b)(2)

93. FOIA exemption (b)(2) states that FOIA does not apply to matters that are "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2).

94. Exemption (b)(2) encompasses two distinct categories of information: (a) internal information of a less significant nature, such as administrative routing notations and agency rules and practices, sometimes

_____

referred to as "low 2" information; and (b) more substantial internal information, the disclosure of which would risk circumvention of a legal requirement, sometimes referred to as "high 2" information.

95. CIA has properly invoked Exemption (b)(2) in this case to withhold the following "low 2" information from only two documents (document #'s 1391030 and 1385928): signature of a CIA officer, internal filing instructions, and an internal cover sheet with administrative routing information.[11] There is no public interest in the disclosure of such internal procedures and clerical information that would justify the administrative burden that would be placed upon CIA. As described in the attached *Vaughn* index, the Agency has carefully reviewed each page of every document and released all reasonably segregable information.[12]

### C. FOIA Exemption (b)(3)

96. Much of the withheld information is exempt from disclosure under FOIA exemption (b)(3), 5 U.S.C. §552(b)(3), because it concerns intelligence sources and/or methods, and CIA organizational/functional information.

---

[11] CIA has not invoked Exemption (b)(2) to withhold "high 2" information.
[12] This information is also independently and coextensively exempt from release pursuant to exemption (b)(3). See ¶96, below

FOIA exemption (b)(3) states that FOIA does not apply to matters that are:

> . . .specifically exempted from disclosure by statute . . . provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

97.   One (b)(3) withholding statute exempts the CIA information at issue.  Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 403g, provides that the CIA shall be exempt from the provisions of any law requiring the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the CIA.  Thus, under Section 6, CIA is exempt from disclosing any information relating to its core function:  foreign intelligence collection through its intelligence sources and methods.  See infra n. 2.  Thus, information falling within the scope of this statute is exempt from disclosure under FOIA exemption (b)(3).

98.   As described in the attached Vaughn index, and as set forth below, the Agency has withheld documents in their entirety, or in part, based on this independent (b)(3) ground.

### 1. Dissemination-Control Markings

99.   CIA withholds certain markings as exempt internal organizational data under Section 6 of the CIA Act (and, thus, Exemption (b)(3)).  See 50 U.S.C. 403g, and thus these markings and intelligence methods are exempt under FOIA Exemption (b)(3). CIA's intelligence methods involve information protection and dissemination, including, in some cases, restricting the dissemination of particularly sensitive information contained in documents.  Although dissemination-control markings, standing alone, may be unclassified, when they are placed in the context of substantive reporting or analysis they may reveal or highlight areas of particular intelligence interest, sensitive collection sources or methods, or disclosure of which would reasonably damage foreign relations or activities of the United States.

100. To avoid highlighting information revealing such matters, the Agency generally withholds all dissemination-control markings.  Otherwise, CIA would be focusing public attention on those cases where we withheld dissemination-control markings because the accompanying information is of special intelligence interest, was collected through particularly sensitive methods, or disclosure of which would reasonably damage foreign relations or activities of

45

the United States.   In any event, and as a practical

matter, deleting dissemination-control markings rarely

deprives a requester of the information he or she is

actually seeking.

### D. **FOIA Exemption (b)(6)**

101.   FOIA exemption (b)(6) provides that FOIA does

not apply to matters contained in "personnel and medical

files and similar files, the disclosure of which would

constitute a clearly unwarranted invasion of personal

privacy."  5 U.S.C. § 552(b)(6).   The CIA has withheld

certain information on the ground that, if disclosed, it

would constitute a clearly unwarranted invasion of the

personal privacy of third parties by revealing their names

and other identifying (including biographical) information.

As described in the attached *Vaughn* index, the Agency has

carefully reviewed each page of every document and released

all reasonably segregable information.

102.   In invoking FOIA exemption (b)(6), the threshold

inquiry is whether the particular information in question

qualifies as "personnel," "medical," or "similar"

information.   Information that applies to or describes a

particular individual's (or their family's) biographical

history, clearly falls within these FOIA categories.  Here,

the information at issue identifies the names of, and/or

identifying information about (including biographical information), specific individuals, including CIA employees, and their family members.  Therefore, I have determined that this information qualifies as "personnel," "medical," or "similar" files, and because its disclosure would constitute a clearly unwarranted invasion of the personal privacy of third parties, it is subject to (b)(6) protection.

103.  Once this threshold has been met, the Agency is required to balance the interests between safeguarding an individual's private affairs from unnecessary public scrutiny against the public's right to government information.  In this case, no overriding public interest requires the disclosure of the names of, or identifying information about CIA employees or about CIA family members contained in the documents.

104.  Even if some minuscule public interest could be found in disclosing the third-party information at issue, the balance would still tilt dramatically against disclosure.  Disclosure of this personal information would certainly violate the personal privacy of these third parties.  Because the privacy interests involved will clearly outweigh the negligible public interest in

disclosure, I have determined that the information should
not be disclosed.

### E. FOIA Exemption (b)(7)(E)

105. FOIA exemption (b)(7)(E), 5 U.S.C. §
552(b)(7)(E), which has been invoked for information from
only one document (#1385928), authorizes the withholding
of:

> records or information compiled for law enforcement
> purposes, but only to the extent that the production
> of such law enforcement records or information ... (E)
> would disclose techniques and procedures for law
> enforcement investigations or prosecutions, or would
> disclose guidelines for law enforcement investigations
> or prosecutions if such disclosure could reasonably be
> expected to risk circumvention of the law.

106. The one (b)(7)(E) document is a record
containing information derived from a polygraph interview.
The information that has been withheld could reasonably be
expected to provide insight into CIA Security Center's
clearance and investigatory processes, as well as certain
techniques and procedures used by law enforcement agencies
in coordination with CIA during those processes.

107. The one (b)(7)(E) document is a record containing information derived from a polygraph interview. The information that has been withheld could reasonably be expected to provide insight into CIA Security Center's clearance and investigatory processes, as well as certain techniques and procedures used by law enforcement agencies in coordination with CIA during those processes.

108. Accordingly, because the release of the withheld information would disclose Agency investigatory techniques and procedures, as well as those of certain law enforcement agencies, CIA properly invoked FOIA exemption (b)(7)(E). As this information involves intelligence sources and methods, and CIA organizational/functional information, it is also exempt from disclosure pursuant to FOIA exemption (b)(3).

\* \* \* \*

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this ___th day of January, 2007.

Marilyn A. Dorn
Deputy Chief, PCAS
Central Intelligence Agency

49